PEOPLE v. LAESSER.

(Supreme Court, Appellate Division, Fourth Department. January 6, 1903.)

1. HEALTH—ADULTERATION OF MILK—PENALTIES—QUESTION FOR JURY.
     In an action to recover a penalty provided by Laws 1893, c. 338, §§ 22, 37, as amended by Laws 1900, c. 101, for the sale of adulterated milk, where the evidence of the state inspectors that the milk from which the samples were taken was thoroughly stirred, was not contradicted, and

there was no other proof tending to impeach the fairness of the samples or the correctness of the analysis, the evidence did not authorize a submission of the fairness of the samples to the jury.

2. SAME—STATUTES—CONSTITUTIONALITY—DISCRIMINATION.

Laws 1893, c. 338, as amended by Laws 1900, c. 101, provides that no person shall sell or exchange, or offer or expose for sale or exchange, any unclean, impure, unhealthy, adulterated, or unwholesome milk, and declares that, if the milk is delivered by the "producer" for manufacture, sale, or shipment, or from a "milk vender who produces" the milk which he sells, and it is designed to prosecute such producer, a sample shall be taken from the "mixed milk of the herd of cows" from which the milk claimed to be adulterated was drawn. *Held*, that the statute was not unconstitutional in that it required a test of the milk of the herd to be made when it was sought to prosecute the producer, while it authorized a conviction of the milk vender on samples taken from the milk sold by him.

3. SAME—SAMPLES TAKEN FROM PEDDLER.

A milk vender in a city had in his wagon two cans of milk, one a 32-gallon can and the other a 10-quart can, which contained about 6 quarts of milk, from which he was delivering milk to customers at the time he was approached by state milk inspectors, who thoroughly stirred the milk in the small can, and took therefrom two samples, one of which was delivered to the vender and the other sent to the state chemist for analysis. *Held*, that evidence that the samples as so taken were adulterated authorized a recovery of the penalty prescribed by Laws 1893, c. 338, as amended by Laws 1900, c. 101, providing that no person shall sell or expose for sale or exchange any adulterated milk, etc.

4. SAME—INNOCENCE OF SELLER—EVIDENCE.

In an action against a milk vender to recover a penalty prescribed by Laws 1893, c 338, § 37, for selling adulterated milk, which defendant had purchased from the producer, evidence of defendant and his wife that they had not tampered with the milk was incompetent, where the fairness of the samples shown to be adulterated or of the analysis was not impugned.

5. SAME—HERD SAMPLE—FAILURE TO TAKE—EVIDENCE.

Laws 1893. c. 338, as amended by Laws 1900, c. 101, prohibits the sale of adulterated or unwholesome milk, and provides for the taking of samples by state inspectors for analysis. The statute also requires that when the milk is delivered by the producer for manufacture, sale, or shipment, or from a milk vender who produces the milk which he sells, and it is designed to prosecute such producer, a sample shall be taken from the mixed milk of the herd of cows from which the milk claimed to have been adulterated was drawn. *Held*, that since, in a prosecution of a milk vender not a producer of the milk sold, no herd sample was required to be taken, evidence that no herd sample was taken from the producer of the milk sold by the vender was incompetent.

6. SAME—INTENT.

In an action to recover the penalty prescribed by Laws 1893, c. 338, § 37, for the sale of adulterated milk, the question of the vender's intent is immaterial.

McLennan, J., dissenting.

Appeal from trial term, Monroe county.

Action by the people against Emil Laesser to recover a penalty for the sale of adulterated milk. From a judgment in favor of defendant and from an order denying a new trial the people appeal. Reversed.

Argued before McLENNAN, SPRING, WILLIAMS, HISCOCK, and DAVY, JJ.

Eugene J. Dwyer, for the People.
John Bernhard, for respondent.

SPRING, J. This action was brought to recover a penalty for selling adulterated milk in violation of section 22, c. 338, Laws 1893, as amended by chapter 101, Laws 1900. Section 22 provides that "no person shall sell or exchange or offer or expose for sale or exchange any unclean, impure, unhealthy, adulterated or unwholesome milk." Section 37 of the original act prescribed penalties for a violation of its provisions. On the 13th day of January, 1900, the defendant, by his agent, one Vaughan, was selling milk about the city of Rochester. Two inspectors in the employ of the department of agriculture of the state made a lactometer test of the milk in a small peddling can containing about six quarts, and immediately thereafter caused it to be thoroughly stirred, and then took two samples therefrom, sealing them up, as required by the statute, and immediately delivered one to the agent of the defendant who was peddling the milk and the other to the state chemist. A subsequent chemical analysis of this milk delivered to the chemist showed that it was adulterated, within section 20 of chapter 338, referred to, and which defines adulterated milk. The analysis showed that the percentage of water was 88.56 and of solids 11.44. The question was submitted to the jury as to the fairness of the taking of the samples of milk. The witness Vaughan, who was the agent of the defendant, testified that he was delivering the milk to the defendant's customers when the samples were taken by the inspectors, and that he continued to do so thereafter. The two inspectors testified, as to the manner in which the samples were taken, that one of them requested Mr. Vaughan to stir the milk thoroughly, which he did, and, after this was done, the milk composing the samples was poured in the bottles. Vaughan testified that he stirred the milk "good" before starting on his trip that morning, but had no recollection of just how the milk was taken for the samples. There was no other proof given upon this subject, and the correctness of the analysis of the chemist was not impeached. There was, therefore, no question of fact from this evidence to be submitted to the jury as to the fairness of the samples taken. While this action is to recover a penalty, it is still a civil action, and, if the evidence is undisputed, or at least is not fairly susceptible of an inference against the positive testimony of the witnesses, there is no question of fact to be submitted to the jury. It has been held that even the credibility of a party when his evidence is explicit, and without any suspicion or unusual circumstance tending to show its improbability, does not inflexibly require the submission of the case to the jury. Hull v. Littauer, 162 N. Y. 569, 57 N. E. 102. We appreciate that in several cases the question of the fairness of the sample was submitted to the jury, and that ordinarily, in actions of this character, that question is one of fact. But in each of those cases there was some independent evidence tending to impeach the fairness of the sample.

When milk is delivered by the producer "for manufacture, sale, or shipment, or from a milk vender who produces the milk which he sells," and it is designed to prosecute such producer, the statute provides for taking a sample of the "mixed milk of the herd of cows" from which the milk claimed to be adulterated was drawn; that is, the statute aims to prevent offenses by the original producer, and also

by any person who sells unwholesome milk. In the larger cities the great bulk of the milk is not sold by the producers. It is shipped to the city, mixed indiscriminately, and sold by peddlers from house to house. It is impossible, therefore, in the latter case to make any test of the milk to be compared with from the herd. There is no unfair discrimination for or against any one. Whoever sells milk not up to the arbitrary standard prescribed by the statute is liable for the penalty provided by section 37 of the act. Every producer, as an extra guard against unjust prosecution, may have the milk of his herd compared with that which is claimed to be unwholesome, and that relates to the manner of ascertaining the quality of his milk. The statute gave no such privilege to the peddler who was not the producer, because no herd sample could be obtained. The statute was passed in view of existing conditions, and must be construed in a way to be fairly adapted to them. The illustration in the opinion of Justice McLENNAN of the farmer whose milk is divided at a street corner is an unusual one. It may be that, if the milk came direct from the producer to the peddler, and was sold by him unmixed with any other, a fair construction of the statute would permit him to have the comparative test made with that from the herd. It is to be noted in construing this statute that milk which comes from the herd is not likely to be adulterated within the statutory definition. The standard fixed is on the assumption that milk which does not conform to it in quality is unwholesome, and not suitable for human consumption; and we can hardly conceive of a herd of cows, whatever may be their food, and however emaciated or poorly cared for they may be, whose milk product is within the condemnation of the statute. If such an exceptional instance exists, it must yield to the general welfare of mankind, for whose benefit the law was enacted. It is also to be understood that the lawmakers are seeking to check the sale of unhealthy milk, and in one instance provided a means for making the test, and the method there provided may not be applied to a peddler because the conditions are not the same, and the distinction is not due to an attempt to legislate in behalf of the farmer and against the peddler.

In the Wiard Case, 61 App. Div. 612, 69 N. Y. Supp. 1142, the decision was based upon the fact that the delivery of the milk was to a single purchaser. Eight cans of the milk had been taken by the producer to the railroad station, and the sample tested was from only one of these cans. That sample was compared with a sample from the herd. It might well be that no fair comparative test could be made of a sample from a distinct part of the milk with the mixed milk of the whole herd. In the present case the peddler was engaged in selling milk from the smaller can when apprehended by the inspectors. The sample was taken from the can out of which he was selling the milk. The peddler may have a dozen cans of milk on his wagon, or he may have disposed of the greater part of it. The reason for mixing the entire milk together does not obtain in his case, for two reasons: The milk is not to be tested with that from the herd, and it would not be feasible to do so, for a part may already have been sold by him, and the mixing would be impracticable or impossible. If the milk he has in the can from which he is selling is stirred properly, and proves to be

below the standard, the liability attaches. The Wiard Case has no application to milk taken from a peddler.

Upon the trial of this action, and under the objection of the plaintiff, the defendant was permitted to show by the defendant and his wife that they had not tampered with this milk. We think this evidence was incompetent. If the fairness of the sample or the correctness of the analysis had been impugned in any way, the evidence might be competent as bearing upon either of those questions, but it is not permissible in and of itself, and without any other proof attacking the plaintiff's case, to raise a question of fact, and thus secure a submission of the case to the jury. If testimony of this character is to be received, then the purpose of this salutary statute will be thwarted. If this rule obtains, and the sample shows the milk very badly adulterated, containing water largely above the margin prescribed by the statute, the defendant may always make a question of fact by stating that he or those in charge of the milk had not interfered with it. The offense at which the statute aims is selling or exposing for sale adulterated milk, and the statute has defined what constitutes adulteration. The only requisite to a cause of action is proof of a sale of this kind. People v. Kibler, 106 N. Y. 321, 12 N. E. 795. The injurious effects which may result from drinking impure milk, the difficulty in detecting its impurities by the customers, the enormous extent to which it enters into the food supply, and the temptation to adulterate it render it essential that the purpose of the statute be adhered to somewhat inflexibly by the courts. In the present case, Zuber, who furnished the milk to Laesser, may have added water or some ingredient to the milk, so that the testimony of the defendant or his wife proves nothing. And yet the defendant, though innocent, is amenable to the payment of a penalty if he sells milk which comes within the condemnation of the statute. Milk sold throughout a city may often change hands several times before reaching the consumer, and it would impair the efficiency of the statute to allow the last seller to be exonerated by swearing to his own honesty. It would likewise create confusion and uncertainty to permit each person who has sold the milk to exculpate himself by proof of this kind unless there is some evidence, or some reasonable inference, that the samples were unfairly taken, or the analysis is unsatisfactory. We are aware that proof of this kind has been given in actions for penalties for delivering impure milk to a cheese factory or creamery, as has been stated; but a different method obtains in a case of that kind, as samples must be taken from the herd of the producer, and the statute minutely provides how this shall be done, and seems to imply that it may be shown that such milk "was just as it came from the cow" when delivered to the factory. Milk, however, is delivered about the cities by peddlers, and not producers of the milk, and the feature of the statute applicable to dairymen would not be practicable as applied to these peddlers. It appeared on the trial that the milk was obtained from one Zuber, who delivered it at the station of the New York Central & Hudson River Railroad Company in Rochester. The defendant was permitted to show that no herd sample of Mr. Zuber's milk was taken. This evidence was objected to, and an exception taken. We think the evi-

dence was incompetent. As already suggested, the necessity of taking samples of the milk from the herd is not required where milk is delivered about the city. This court has already held that this statute is constitutional. People v. Hills, 64 App. Div. 584, 72 N. Y. Supp. 340. The question of intent does not enter into actions of this kind. People v. Kibler, 106 N. Y. 321, 12 N. E. 795.

The judgment and order should be reversed, and a new trial granted, with costs to the appellant to abide the event.

WILLIAMS and HISCOCK, JJ., concur. McLENNAN, J., dissents in an opinion. DAVY, J., not voting.

McLENNAN, J. (dissenting). It seems to me that the decision of this court in the case of People v. Wiard, 61 App. Div. 612, 69 N. Y. Supp. 1142, affirmed in 170 N. Y. 590, 63 N. E. 1120, furnishes the rule of law applicable to the case at bar, and should be regarded as controlling upon this court, and as decisive of this case. The rule laid down in the Wiard Case, supra, was stated in the following language, namely:

"Held, that the analysis of a sample of milk taken from only part of the product delivered by the producer at any one time to a single purchaser will not afford a basis for an action for a penalty under the agricultural law (Laws 1893, c. 338)."

The statement of the rule is clear and unambiguous, and its meaning ought not to be doubtful, yet when the facts of the Wiard Case and the questions which were there involved are recalled, perhaps the exact meaning of the decision is made even more apparent. In the Wiard Case the defendant, on the 8th day of June, 1899, delivered eight cans of milk, produced upon his farm, at the railroad station in Markham, in the county of Monroe. One of the inspectors in the employ of the agricultural department of the state, after thoroughly stirring the contents of a single can of milk, took two samples from such can, one of which he delivered to the defendant and the other to a chemist for analysis. Samples were also taken from the other cans, but, so far as appears, were not delivered to the chemist or analyzed. The chemist analyzed the sample delivered to him, and found the percentage of water by weight to be 88.15 per cent., total solids 11.85 per cent., fat 2.94 per cent. On the 13th day of June, 1899, the inspectors went to the barn of the defendant, and took a sample of the milk of his entire herd, after it had been thoroughly mixed, and such sample was delivered to the chemist. Upon analysis it was found to contain 87.94 per cent. water, total solids 12.06, fat 3.14 per cent; so that it will be seen that the sample taken at the railroad station contained $21/100$ more water, $21/100$ less solids, and $20/100$ less fat than the sample of milk taken at Wiard's barn. In that case it was not contended that the analysis was not properly made; that the samples were not taken in all respects as required by law, except that the sample taken at the railroad station was not taken from the entire quantity of milk delivered, after it had been mixed. Upon that state of facts, and passing upon that single question, this court held—which decision was unanimously affirmed by the court of appeals—that the

analysis of the sample taken at the railroad station, although showing such an inferior quality of milk as compared with the sample taken at defendant's barn, was not proper to be even considered as a basis for a recovery against the defendant under the agricultural law, for the sole reason that the sample had not been taken from the entire quantity of milk after the contents of the eight cans had been mixed, and it was held that the plaintiff's complaint in that case was properly dismissed by the learned trial court. A minority of the court at the appellate division, as appears by the decision, was of the opinion that under all the circumstances it was a question of fact for the jury whether or not the sample taken at the railroad station was a fair sample, and that, if found to be a fair sample, it could be considered by the jury in determining whether the defendant in that case had adulterated and offered for sale adulterated milk; but such view was not thought to be tenable by a majority of the court, or by the court of appeals.

In the case at bar the defendant, through his hired man or agent, was, on the 13th day of September, 1900, engaged in selling milk in the city of Rochester. He had upon the wagon two cans of milk, one a 32 gallon can and the other a 10-quart can, which, at the time in question, contained 3 or 4 quarts of milk. As the defendant's agent came out of a restaurant or saloon in which he had been delivering milk out of the smaller can, an inspector of the agricultural department, after stirring the milk in the small can, took two samples of milk from it, sealed them, delivered one to the defendant's agent and the other to Mr. Latimer, the chemist. The chemist analyzed the sample delivered to him, and found that it contained 88.56 per cent. water, 11.44 solids, and 3.04 fat; showing that the milk was at least as good as the milk taken at the railroad station in the Wiard Case. It appears that the three or four quarts of milk from which the sample was taken were not sold to or intended for a single purchaser, if that may be considered material. But in the Wiard Case it in no manner appeared that the eight cans of milk were sold and delivered to or intended for a single purchaser. In fact, it was alleged in the complaint in that case, was admitted in the answer, and was in no manner controverted by the evidence, that the defendant was engaged at the time in question in selling and delivering milk to various dealers in the city of Rochester. In this case we simply have the analysis of the chemist of the sample taken from one of two cans upon defendant's wagon, which can contained about three quarts of milk, from which the defendant's agent had been selling from time to time; yet it is held, in substance, in the prevailing opinion, that upon such analysis alone the defendant shall be held, as matter of law, guilty of a violation of the agricultural law, and liable for the penalty imposed, notwithstanding it appears by the uncontradicted evidence that unadulterated milk, in the condition in which it comes from the cows, may fall below the standard prescribed by the state, and notwithstanding it further appears that in milk which has been permitted to stand, as the milk in question had stood, the fats rise to the top, and thus it would naturally be first removed from the can. Whatever our individual views may have been prior to the decision of this court and the court of appeals in the Wiard Case, it seems to me that it ought now to be regarded as settled that

an analysis of a sample of milk taken as was the one in question cannot be made the basis of a recovery against a defendant charged with selling adulterated milk. The suggestion that such holding will render the law difficult of enforcement, or, in effect, nugatory, ought not to be regarded as of importance, when the statute, as interpreted by the court of last resort, is plain and unambiguous. The legislature is charged with the duty of formulating a statute that is practical and enforceable, and not the court. In the Wiard Case it was held that it would not answer to take a sample of milk for analysis from one of eight cans, notwithstanding the fact that such analysis was corroborated by the analysis of another sample taken from the milk of the entire herd. We therefore are unable to see how it will answer to say in this case that the analysis of a sample taken from one of two cans will serve such purpose, and that it may be made the basis of a recovery against the defendant.

There is nothing in the case at bar to show that the milk which was being offered for sale by the defendant was not in precisely the same condition as it was when it came from the cows, and we think, until evidence is produced tending to show that the defendant's milk was adulterated, he ought not to be held liable for the penalty prescribed by the statute. It was for the very purpose of avoiding such a condition of things in the case of a producer of milk that the further provision was added to the statute requiring the milk of the herd to be examined, so that it might be determined whether or not it had been adulterated. It cannot be possible the statute means, when properly interpreted, that if the farmer who produced the milk in question had sold it all to the defendant, the analysis, as made in this case, could not form the basis of an action against the farmer; but that, as against the defendant, the purchaser of the milk, who was engaged in selling it in precisely the same condition as it was when received, such analysis, as matter of law, entitles the plaintiff to recover. Yet such is the precise effect of the two decisions. A farmer, a producer of milk, sells and is about to deliver eight cans of milk at one time to a single purchaser. A sample is taken by an inspector from one of the cans, who procures it to be analyzed, and it is found to be below the standard prescribed by the state. Clearly, under the decision in the Wiard Case, such a decision cannot form the basis of an action against the farmer, solely because the contents of the eight cans were not mixed and the analysis was not of a sample of the mixed product. Under the decision of the court in the case at bar, if the purchaser of the eight cans of milk attempts to sell it to the inhabitants of a city, a like sample may be taken from the same can, the same analysis made showing the same result, and such analysis, as matter of law, is sufficient to entitle the people to recover from the purchaser of the eight cans of milk the full penalty prescribed by the statute. In other words, a farmer may sell with impunity milk below the standard, where and when he pleases, and wholly without reference to what its analysis may show, provided only it is of a quality which his cows actually give when not improperly fed. But a person who may buy the same milk, and attempt

to resell it, if an analysis shows it is below the prescribed standard, is, as matter of law, liable for the penalty named in the statute. Presumably, the statute was enacted for the protection of the consumers of milk, and not for the purpose of enabling the state to punish one class of its citizens for selling a quality of milk which another class may perchance sell without restraint. If the decision in this case and in the Wiard Case correctly interpret the statute, there is much force in the contention of defendant's counsel that the act is unconstitutional, for the reason that it discriminates in favor of venders of milk produced by them as against sellers of milk which is purchased and is not produced by such sellers. To prove that such discrimination may exist under the statute as interpreted, no more apt illustration can be made than that suggested by defendant's counsel. A farmer milks from his cows milk which is below the standard,—say 40 gallons of it. All is thoroughly mixed, and is of precisely the same quality. He takes it to the city to sell, and at a certain street corner he sells 20 gallons to a milk peddler, who immediately goes along the street from house to house selling the milk which he has purchased. The farmer goes in the opposite direction, also going from house to house, selling the remaining 20 gallons of milk. A sample of the milk being sold by each is taken by the state's inspectors. The analysis of each sample is identical, and shows that both are below the standard. The farmer cannot be prosecuted, notwithstanding the analysis, because the quality of the milk is exactly the same as when it came from his cows. The milk peddler, on the other hand, would be liable, as matter of law, under the decision in this case, solely because the analysis of the sample of the milk taken from him showed it to be below the standard. However, in this case it is only necessary to hold that whether or not the sample taken from the defendant was a fair sample is a question of fact for the jury.

The learned county judge allowed the certificate of the chemist to be received in evidence, and he submitted to the jury the single question whether, under the circumstances disclosed by the evidence, the sample taken was a fair sample, stating to the jury that, if they found it was, then the plaintiff could recover, but that if they found it was not a fair sample, their verdict should be for the defendant. We think the instruction was as favorable to the plaintiff as it was entitled to. The jury, by its verdict in this case, found that the agent of the agricultural department did not take a fair sample when he took it from what remained in the bottom of the 10-quart can, when there was a 32-gallon can of milk upon the same wagon, and we think the verdict was amply supported by the evidence.

These views lead me to conclude that the judgment and order appealed from should be affirmed, with costs, upon the authority of People v. Wiard, 61 App. Div. 618, 69 N. Y. Supp. 1142, affirmed in 170 N. Y. 590, 63 N. E. 1120.