550 So.2d 112 (1989)
EVANS PACKING COMPANY, Appellant,
v.
DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Appellee.
No. BP-312.
District Court of Appeal of Florida, First District.
October 3, 1989.
*113 Charlie Luckie, Jr., of McGee, Luckie, Tyner, a div. of Dayton, Sumner, Luckie & McKnight, Brooksville, for appellant.
Frank A. Graham, Jr., Resident Counsel, Dept. of Agriculture and Consumer Services, Tallahassee, for appellee.
ZEHMER, Judge.
Evans Packing Company appeals a final order of the Department of Agriculture and Consumer Services that suspended Evans's license to operate as a citrus fruit dealer for two years and directed it to pay an administrative fine of $200,000. Because the order is based upon an erroneous construction and application of the statutes involved and the record is wholly lacking in clear and convincing proof that Evans violated the statutes as charged, we reverse with directions that the administrative complaint against Evans be dismissed.

I.
The four-count administrative complaint alleges that Evans Packing Company is a citrus fruit dealer holding a license issued by the Department of Agriculture and that the Department "seeks to impose the disciplinary sanctions authorized by s.601.67, Fla. Stat.," because "respondent has violated, *114 or aided or abetted in the violation of, certain laws of this state governing or applicable to citrus fruit dealers and certain lawful rules" of the Department. It further alleges that on four different occasions, each date being identified in a separate count, Evans produced and sold a quantity of frozen concentrated orange juice, identified by a different sample number for each date, that "contained soluble solids recovered by aqueous extraction or washing of fruit pulp, commonly known as pulpwash," in violation of section 601.9909, Florida Statutes (1979),[1] and Rule 20-64.07, Florida Administrative Code.[2] Essentially, it was the Department's position that the described samples had been tested using the "Petrus test" with positive results showing the presence of pulpwash additive in each batch, and that Evans was therefore guilty of selling and shipping frozen concentrated orange juice adulterated with pulpwash in violation of section 601.9909. The Department contended that proof of the presence of pulpwash was legally sufficient to support the charge against Evans because it was immaterial and irrelevant under the statute whether such adulteration was knowingly or intentionally caused by or attributable to some act of fault on the part of Evans in producing the frozen concentrate for sale.

A.
The matter came on for a section 120.57(1) hearing, and the hearing officer accepted the Department's position. Upon considering the extensive evidence adduced at the hearing by both parties, the hearing officer entered a recommended order containing the following finding of fact regarding the "Petrus Method" for detecting pulpwash in frozen concentrated orange juice:
4. The Petrus Method was developed by Donald R. Petrus, of the Florida Department of Citrus, and a recognized expert in the field of adulteration of orange juice, after a ten-year accumulation of spectral data on FCOJ. The Petrus Method is based on inherent spectroscopic differences in FCOJ and pulpwash using two spectroscopic techniques: (1) absorption spectra (UV/VISIBLE) and (2) fluorescence spectra. The absorption spectra measures the ability of components within an alcoholic extract of FCOJ to absorb light of specific wavelengths or energy levels. The fluorescence spectra measures the light emitted by those compounds which, after absorbing UV/VISIBLE light energy, emit that light as light energy. The results are interpreted by a qualitative examination of the UV/VISIBLE and fluorescence spectra. This technique is common in scientific analysis, and has existed since the turn of the century. The Petrus Method is recognized by experts in the field of analyzing food products as a valid method for detecting pulpwash adulteration.
(R. 545-46).[3] The hearing officer then found that the Department laboratory *115 "was equipped with the necessary instrumentation for detecting pulpwash adulteration in FCOJ by the Petrus Method," and that the four samples of Evans's products sent to be tested on September 9, 1980, "tested positive for pulpwash adulteration." (R. 546). The hearing officer further found that on January 3, 1980, March 6, 1980, March 17, 1980, and June 28, 1980, Evans sold or shipped quantities of FCOJ identified by the described can code numbers from which the samples were taken, and that such samples from the code number lots "indicated evidence of pulpwash adulteration." (R. 547). On these findings, the hearing officer concluded as a matter of law that:
The four can codes of FCOJ described in the findings of fact contained additives within the meaning of section 601.9909, Florida Statutes, and were mislabeled within the meaning of section 602.24, Florida Statutes. Therefore, Evans, the Respondent, engaged in prohibited acts within the meaning of section 601.9909, Florida Statutes, by including additives and mislabeling the four can codes of frozen concentrated orange juice. These prohibited acts warrant the imposition of the penalties provided for in section 601.67, Florida Statutes.

(R. 548). The hearing officer recommended a two-year suspension of Evans's license and imposition of the maximum fine of $50,000 on each count, totaling $200,000.
Evans filed exceptions to the recommended order, contending the hearing officer erred in finding that the Petrus Method was a valid method for determining the presence of pulpwash additives and erred in concluding that the mere presence of pulpwash was sufficient to support a finding of guilt and imposition of the penalties. Evans argued that under the evidence in the record the pulpwash said to be present in its juice may have been pulpwash that was already present in juice produced in Brazil or juice obtained from other Florida producers (referred to as orange futures), because Evans routinely blended orange juice from these sources with its frozen concentrated orange juice, as permitted by Florida law. Evans also complained that the hearing officer failed to address the correct standard of proof applicable in this license revocation proceeding.

B.
The Commissioner of Agriculture, acting for the Department, denied Evans's exceptions and entered a final order adopting the hearing officer's recommended order in all respects. The final order specifically explained that the statute under which the Department was proceeding
do[es] not require Petitioner to show that adulteration was caused by Respondent. Section 601.9909, Florida Statutes, provides that no frozen concentrated orange juice shall be sold, offered for sale, shipped or offered for shipment which contains any additive of any kind. Thus, the act of selling adulterated FCOJ constitutes the offense.
(R. 561). The order cites the following court decisions from other jurisdictions as support for this legal conclusion: State v. Rogers, 49 N.E. 564 (Me. 1901)[4]; People v. Snowburger, 71 N.W. 497 (Mich. 1897); People v. Kibler, 106 N.Y. 321, 12 N.E. 795 (1887); People v. Laesser, 79 N.Y.S. 470 (1903); and Weigand v. District of Columbia, 22 App.D.C. 559 (C.A.D.C. 1903). These cases stand for the proposition that where a particular statute regulating the quality and adulteration of food does not contain any requirement of knowledge or intentional adulteration of the regulated food product, a violation of the statute may be established without proving the party charged had knowledge of the adulteration or was the perpetrator of an intentional adulteration. Applying the strict liability principle so discerned from these decisions, the Commissioner concluded that it was irrelevant whether Evans had knowledge or guilty intent, and ruled that Evans was guilty as charged. He imposed the recommended *116 two-year suspension and $200,000 administrative fine.

II.
Evans raises several points on this appeal from that order. We discuss only the standard of proof applicable to this proceeding, the type of conduct required under section 601.67(1) to establish guilt, and the sufficiency of the evidence to support the finding of guilt and imposition of penalties.

A.
Going first to the standard of proof issue, we find that the instant proceeding involves the loss of a license to engage in a business or livelihood. We hold that irrespective of whether the license is held by an individual or a corporate entity, it was incumbent upon the Department to prove the charged violation of section 601.9909 by clear and convincing evidence before imposing the penalties under section 601.67. Ferris v. Turlington, 510 So.2d 292 (Fla. 1987).[5] We note that neither the recommended order nor the final order contains any reference to the applicable standard of proof. At the time this case was decided by the hearing officer and the Commissioner, the recognized standard of proof was a sliding scale defined in Bowling v. Department of Insurance, 394 So.2d 165 (Fla. 1st DCA 1981), as greater than a mere preponderance of the evidence and as substantial as the consequences to be suffered. This sliding scale standard was expressly disapproved in Ferris v. Turlington, supra. It is highly doubtful, therefore, that the hearing officer and the Commissioner applied the correct standard because Ferris v. Turlington was decided after both orders were entered in this case.
We are required to apply the law as it stands at the time of our disposition of the appeal. Lowe v. Price, 437 So.2d 142 (Fla. 1983). It is our obligation on appellate review to determine whether the evidence meets that standard. In re Bryan, 14 F.L.W. 440 (Fla. 1989). For the reasons hereafter discussed, we find the record is lacking in proof by clear and convincing evidence that Evans violated the statute as charged. Accordingly, we find it unnecessary to remand this case for further consideration of the findings of fact by the hearing officer and the Commissioner under the more stringent clear and convincing standard of proof. See Bryan, supra.

B.
We next address the type of conduct that must be shown to establish a violation of section 601.9909 for purposes of imposing disciplinary penalties under section 601.67(1). At the outset, we observe that the Florida Citrus Code enacted in 1949[6] is extensive in scope, ranging from the creation of the Florida Citrus Commission to establishing requirements for the labeling of frozen concentrated orange juice. The purposes of the code include stabilizing and protecting the citrus industry of Florida; protecting and enhancing the quality and reputation of Florida citrus fruit and the canned and concentrated products thereof in domestic and foreign markets; providing a means whereby producers, packers, canners, and concentrators of citrus fruit and the canned and concentrated products thereof may secure prompt and efficient inspection and classification of grades of citrus fruit and concentrated products at reasonable cost; and protecting loss through unscrupulous practices and haphazard methods in connection with the processing and marketing of citrus fruit and the canned or concentrated products *117 thereof. See ss. 601.02(1), (2), (4), and (5), Fla. Stat.
Section 601.67(1) authorizes the Department of Agriculture and Consumer Services to revoke or suspend the license of any citrus fruit dealer and impose a fine not exceeding $50,000 per violation upon a sufficient showing that such dealer has done one or more of the prohibited acts described in subparagraphs (a) through (g) of that section.[7] The charge in this case, based on section 601.67(1)(b), alleged that Evans had "violated or aided or abetted in the violation of any law of this state governing or applicable to citrus fruit dealers or any lawful rules of the Department of Citrus... ." Section 601.9909, the law Evans was charged with violating, prohibits the sale or shipment, or offering for sale or shipment, of frozen concentrated orange juice that "contains any additives of any kind."[8] Additive is defined in section 601.03(1) as meaning "any foreign substance which, when added to any citrus fruit juice, will change the amount of total soluble solids or anhydrous citric acid therein, or the color or taste thereof, or act as an artificial preservative therof." Sec. 601.03(1), Fla. Stat. [emphasis added.] Rule 20-64.007(3), Florida Administrative Code, deals with "washed pulp solids" and states that frozen concentrated orange juice "shall not contain soluble solids recovered by extraction or washing of fruit pulp." Reading this rule together with the definition of additives and the prohibition against additives in section 601.9909(4), we conclude that the intent of the statutory provisions and the rule is plainly to prevent the sale or shipment of orange juice to which pulpwash has been added after it has been extracted from the orange and separated from the pulp. In this sense, the statutory prohibition clearly contemplates the wrongful *118 act of adding a prohibited ingredient to the orange juice.
We agree with the Department that proof of the presence of prohibited additives may well be sufficient to establish adulteration in violation of section 601.9909 in certain, if not most, circumstances. Undoubtedly, a dealer can be held absolutely responsible by statute for the purity and quality of the citrus product being sold and shipped, and can be held liable for penalties when the product proves to contain prohibited ingredients. But that strict responsibility can be imposed only where (1) the dealer has complete control of the process so that adulteration cannot occur without its actual or constructive knowledge or participation, or (2) if the process is not entirely within the dealer's control, it is possible for the dealer, before permitting the product to be sold and shipped, to take other steps to prevent distribution of adulterated products, such as analyzing and testing the product for the presence of prohibited ingredients which may have been added by others without the dealer's knowledge or participation. In other words, the dealer can be held strictly responsible for the purity of the product on the theory that it controlled the processing that resulted in the adulteration, or it failed to exercise due diligence in ascertaining the purity of the product by testing before sale and shipment; but a dealer should not be held responsible as a matter of law for adulteration of a product not caused by it in the absence of some available means to test for or otherwise prevent such adulteration.
This construction of the statutory scheme is consistent with the manifest intent of section 601.67(1) to impose disciplinary penalties when the licensed dealer is found to have acted in violation of law by committing a prohibited act or failing to do a required act. Undoubtedly, disciplinary penalties could be imposed upon Evans for having sold and shipped orange juice containing pulpwash additive if the circumstances proven would support findings that the product was adulterated with pulpwash as charged and Evans either caused the adulteration or failed to exercise due diligence to prevent the sale or shipment of the adulterated product. We agree with the Department that it is not necessary to show that Evans intentionally or knowingly violated the statute, i.e., that Evans knew the pulpwash was present, as mens rea is not an element of the statutory violation. However, subparagraphs (a), (c)(g) of section 601.67(1) (see note 7, supra) explicitly or by clear implication require, as a prerequisite to the imposition of disciplinary sanctions, that the accused dealer act or fail to act with knowledge that such conduct violates the law. We find no persuasive reason for giving subparagraph (b) the broad expansive construction urged by the Department so as to warrant the imposition of disciplinary sanctions for adulteration even though the accused dealer had no way of knowing that it had violated the statute, and could not have prevented or detected the violation through the exercise of due diligence.
Additionally, this construction of the statutory scheme is entirely consistent with the legal principles upon which the strict liability cases cited in the final order (identified supra, page 115) were decided. As the court observed in People v. Snowburger, the legal theory of such strict liability statutes is not just to prohibit the affirmative act of adulterating the product, but to reach the negative conduct of failing to ascertain that the product is fit  "the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible." 71 N.W. at 498. In People v. Laesser, where the statute provided that whoever sells milk not up to the arbitrary standard prescribed by the statute is liable for the penalty provided by the statute, the court observed, "The statute was passed in view of existing conditions, and must be construed in a way to be fairly adapted to them." 79 N.Y.S. at 473. Thus, holding that a violation could be proved by analysis of a sample showing that the milk did not meet the statutory standard, the court further noted that proof by the defendant that he had not tampered with the milk which he had obtained from other producers was irrelevant and incompetent unless "the fairness of *119 the sample or the correctness of the analysis had been impugned in any way... ." Id. at 474. In Weigand v. District of Columbia, holding that knowledge and intent were not elements of the statutory offense concerning the minimum quality of the milk,[9] the court observed in respect to such strict liability statutes that if the act requires an impossible thing to be done, or something to be done in an impossible manner, the courts may declare it incapable of enforcement in a particular case, but that such fact does not invalidate the statute; "All statutes must receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion." 22 App.D.C. at 570-71. In each of the cited cases it was possible for the defendant, in the exercise of due diligence, to have ascertained the presence of the prohibited adulteration through the application of known testing procedures.
Our construction of the statutory scheme is also consistent with other licensee disciplinary proceedings that require a showing of personal participation in violating the statute or a failure to exercise due diligence in assuring that others for whom the licensee may be responsible did not so violate the law. E.g. Surf Attractions, Inc. v. Department of Business Regulation, 480 So.2d 1354 (Fla. 1st DCA), rev. denied, 492 So.2d 1331 (Fla. 1986). This construction is likewise consistent with the principles in the cases cited by Evans that a licensee cannot be held strictly liable for adulteration or contamination of a product in violation of a statute when there is proof of an objective impossibility to prevent the violation or the violation is de minimis. See, e.g., United States v. Park, 421 U.S. 658, 673-674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489, 501 (1975); United States v. General Foods Corporation, 446 F. Supp. 740 (N.D.N.Y. 1978), aff'd, 591 F.2d 1332 (2d Cir.1978); United States v. Capital City Foods, Inc., 345 F. Supp. 277 (D.N.D. 1972).

C.
Turning now to the sufficiency of the evidence under the applicable standard, we conclude that the record in this case does not contain competent substantial evidence sufficient to prove by the clear and convincing standard of proof that the orange juice sold and shipped by Evans was adulterated with pulpwash contrary to the statute. Additionally, the evidence does not show that Evans failed to exercise due diligence with respect to the processing and shipment of the citrus products involved, or that Evans caused or participated in causing the alleged adulteration.
The Citrus Code provides, in section 601.24, that the Department of Citrus is to prescribe the methods of testing and grading citrus fruit and canned and concentrated products of citrus fruit.[10] Section 601.25 directs the Department of Citrus to establish, through rules and regulations, the method for testing the percentage of total soluble solids in frozen concentrated orange juice.[11] Section 601.27 directs that inspection in Florida of citrus fruit and canned and concentrated products thereof *120 shall be by persons who are duly licensed or certified by the United States Department of Agriculture as citrus fruit inspectors.
The record in this case does not establish that either the Department of Citrus or the Department of Agriculture had adopted by rule any method for testing the citrus product involved to determine adulteration by the presence of pulpwash. On the contrary, the Petrus Method used by the Department had not been adopted by rule, as required by the statute. Nor was any of the testing or inspecting relied on by the Department performed by persons duly licensed or certified by the United States Department of Agriculture, as no effort had been made by either department to comply with these requirements of section 601.27. The Department's sole proof establishing the presence of pulpwash in the orange juice depended on analyses using the Petrus Method made by inspectors not licensed as required by statute.
Not only was the Petrus Method not approved by rule in accordance with the statute, that testing method had not reached the status and reliability in the scientific community required to prove adulteration by the clear and convincing standard. It is undisputed that the Petrus Method could not test for quantity, but simply reflected the presence of certain soluble solids in unidentifiable quantities. It apparently would reflect the presence of de minimis amounts of the prohibited soluble solids. The Petrus Method was not shown to have been accepted by the Association of Official Analytical Chemists (AOAC), or any other recognized scientific body or organization, at the time the juice in question was processed in 1980; the best the Department could show was that the Petrus Method had been given interim official first action by the AOAC as of the final hearing in June 1985.
The Department concedes that there was no known analytical method for the detection of adulteration of orange juice with pulpwash prior to 1979, and that the Petrus Method was first brought to the Department's attention on January 3, 1980 (which, incidentally, was the date of shipment of the first batch of juice involved in this case). There is no evidence that the Petrus Method was generally available to and used by dealers or processors during the first half of 1980 in testing orange juice for pulpwash adulteration. Scientific witnesses testified at the hearing concerning the lack of an adequate data base to permit use of the Petrus Method, and they suggested that freeze damage to fruit used in processing orange juice concentrate tended to indicate the presence of pulpwash soluble solids in the juice. A research chemist with the United States Department of Agriculture testified to his work on the Petrus Method in relation to the procedures used for its evaluation by AOCA, and he discussed a report on the Petrus Method prepared in 1981 that indicated several deficiencies affecting the reliability of this analysis method.
Even though Mr. Petrus testified that there was no doubt in his mind that the four samples contained pulpwash, this opinion is not sufficient, in the face of the above deficiencies in the testing method, to meet the clear and convincing standard. With the uncertainties demonstrated in this record regarding the reliability of the test in 1980, we are unable to say that the evidence "produces ... the firm belief of conviction, without hesitancy, as to the truth of the allegations sought to be established." Slomowitz v. Walker, 429 So.2d at 800 (see note 4, supra). Adherence to the statutory requirement that testing methods for soluble solids be adopted by rule prevents the kind of dispute and uncertainty presented in this case over the validity of testing methods and results. Although we have recognized that agencies may use scientific methods not adopted by rule in the implementation of statutory directives where nothing in the organic statute mandated its adoption by rule, see Island Harbor Beach Club, Ltd. v. Department of Natural Resources, 495 So.2d 209, 223 (Fla. 1st DCA 1986), rev. denied, 503 So.2d 327 (Fla. 1987), we know of no authority for allowing an agency to use a disputed testing method as the basis for imposition of severe disciplinary penalties when *121 that test has not been adopted in a rule making proceeding as explicitly required by statute. It would be contrary to the statute for us to approve the use of the Petrus Method to establish a violation of the statute prohibiting the addition of pulpwash soluble solids in the citrus product in this case. See State, Department of Natural Resources v. Sunset Realty Corporation, 474 So.2d 363 (Fla. 1st DCA 1985).
Moreover, the recommended order and the final order do not contain any finding that Evans added pulpwash or failed to use due diligence to prevent the sale and shipment of frozen concentrated orange juice contaminated with pulpwash additives. Nor does the record contain any evidence that would support such findings. It appears that Evans used orange juice obtained from Brazil and, at times, from other Florida producers (referred to as orange futures) for blending with orange juice processed in its plant, a practice permitted by law. There was no proof that the Brazilian or other juice used for blending purposes, or the juice as blended, could have been objectively tested for adulteration with pulpwash during 1980. There was no proof of any industry practice or any requirement by statute or rule in effect at that time which required dealers to test orange juice concentrate for pulpwash additives before shipping it. The record at pages 493-494 simply does not support the Department's statement in its brief (page 10) that "there was a method for detecting pulpwash in FCOJ and that the industry knew about it" and that the "testimony of Evans' Quality Control manager indicates that he was well aware of Petrus method." Rather, Evans's quality control manager testified that in 1980 they had no technology available to processors for detecting pulpwash. The only available method of testing referred to by the Department was the Petrus Method it had first learned about in January 1980. The Department's emphasis on the fact that at the time of the final hearing in 1985 the Petrus Method had received interim official first action status by the AOAC misses the point completely. It was the acceptability and use of a test method for detecting pulpwash adulteration in orange juice in 1980, when this juice was processed, that was of critical importance in determining whether Evans failed to comply with required standards or practices in producing and shipping its frozen concentrated orange juice. The record contains no evidence to establish that any processor in Florida was so using the Petrus Method, or that the method was widely known and relied upon as a means of detecting and avoiding shipping juice adulterated with pulpwash.
Finally, there was no proof that pulpwash was added to the orange juice by Evans, that Evans knew it was present, or that Evans aided and abetted someone else in so adulterating the product. The Department contends that whether it proved Evans added the pulpwash is immaterial, stating in its brief at page 12:
The Department has never alleged that Evans contaminated FCOJ. Instead, it is the Department's position that four lots of FCOJ produced by Evans were adulterated with pulpwash contrary to law. Evans Quality Control Manager testified that pulpwash was processed separately. (R. 483, 484). If this is true, then pulpwash adulteration was clearly avoidable since it required a separate conscious act  the act of adding it back in. Adulteration by a conscious act is a separate issue from unavoidable contamination of food by minute amounts of filth.
This argument strongly suggests that in the Department's view, its case is based on the implication, from the presence of adulteration found by the Petrus Method test, that Evans must have added pulpwash to the juice. But the record does not support such an implication in this instance. Not only have we rejected the competency of the results of the Petrus test to establish the presence of pulpwash, but the evidence established several other potential sources of pulpwash adulteration not attributable to Evans "adding it back in," and to reach the implication urged by the Department would require speculation by piling inference upon inference in the absence of competent proof of a negative fact.

*122 III.
In summary, this record does not demonstrate by clear and convincing evidence that Evans caused the adulteration of the tested lots of juice with pulpwash, or that Evans failed to exercise due diligence to prevent such adulteration, or that the juice so analyzed was shown to be so adulterated by tests approved and administered in accordance with statutory requirements. The appealed order must, therefore, be reversed and the cause remanded with directions to dismiss the administrative complaint against Evans.
REVERSED AND REMANDED.
SHIVERS, C.J., and PEARSON, TILLMAN (Ret'd), Associate Judge, concur.
NOTES
[1] All references will be to Florida Statutes (1979) unless otherwise indicated because the statutes as published in that edition are applicable to the charges in this case.
[2] The alleged adulteration with pulpwash did not render the product unfit as food; it diminished the quality of the product as Florida frozen orange juice concentrate. Pulpwash consists primarily of the residue left in an orange after the juice has been squeezed out of it, primarily orange rag and pulp, which is then passed by machine through finishers and washed with water. This pulpwash is usually stored in tanks completely separate from the orange juice and put through an evaporator. The resulting product is then placed in holding tanks and eventually put in drums for sale in the commercial market. The taste of pulpwash can vary widely from very bland to very bitter. The Florida Quality Advisory Commission has determined that the presence of pulpwash is detrimental to the quality of orange juice and should not be permitted in frozen concentrated orange juice produced in Florida.
[3] The test is a qualitative, not a quantitative, one, and thus can only test for the presence of the substance but not the amount present. Accordingly, it is referred to in the record as a "pass/fail" test. Although the technology for using spectroscopic analysis of materials has been recognized and used in the scientific community for many decades, persons knowledgeable in its use are aware, and the record reflects, that development of a large and sufficient data base for comparison of the measurements by the spectrophotometer is of critical importance to the accuracy and validity of this analytical technique.
[4] This citation in the order is incorrect; the correct citation is: State v. Rogers, 95 Me. 94, 49 A. 564 (1901).
[5] That standard has been described as follows:

[C]lear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the evidence must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact the firm belief of conviction, without hesitancy, as to the truth of the allegations sought to be established.
Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983).
[6] The Act may be referred to as "The Florida Citrus Code of 1949." See § 601.01 et seq., Fla. Stat. (1979).
[7] Section 601.67(1) provides:

(1) The Department of Agriculture and Consumer Services may impose a fine not exceeding $50,000 per violation against any licensed citrus fruit dealer for violation of any provision of this chapter, and, in lieu of, or in addition to, such fine, may revoke or suspend the license of any such dealer when it has been satisfactorily shown that such dealer, in his activities as a citrus fruit dealer, has:
(a) Obtained a license by means of fraud, misrepresentation, or concealment;
(b) Violated or aided or abetted in the violation of any law of this state governing or applicable to citrus fruit dealers or any lawful rules of the Department of Citrus;
(c) Been guilty of a crime against the laws of this or any other state or government involving moral turpitude or dishonest dealing, or has become legally incompetent to contract or be contracted with;
(d) Made, printed, published, distributed, or caused, authorized, or knowingly permitted the making, printing, publication, or distribution of false statements, descriptions, or promises of such a character as to reasonably induce any person to act to his damage or injury, if the said citrus fruit dealer then knew, or, by the exercise of reasonable care and inquiry, could have known of the falsity of such statements, descriptions, or promises;
(e) Knowingly committed or been a party to any material fraud, misrepresentation, concealment, conspiracy, collusion, trick, scheme, or device whereby any other person lawfully relying upon the word, representation, or conduct of the citrus fruit dealer shall act to his injury or damage;
(f) Committed any act or conduct of the same or different character of that hereinabove enumerated which shall constitute fraudulent or dishonest dealing; or
(g) Violated any of the provisions of ss. 506.19 through 506.28, both sections inclusive.
[8] Section 601.9909 reads in its entirety as follows:

Subject to the provisions of ss. 601.9913 and 601.9914, no frozen concentrated orange juice shall be sold, offered for sale, shipped, or offered for shipment which:
(1) Is concentrated to less than 41.8 or more than 47 degrees Brix. The Brix reading, if determined refractometrically, shall include corrections for citric acid.
(2) Has a lower ratio of total soluble solids to anhydrous citric acid of less than 12 to 1 or a higher ratio of total soluble solids to anhydrous citric acid than 19.5 to 1.
(3) Contains more than 0.120 millileters of recoverable oil per 100 grams of concentrate.
(4) Contains any additives of any kind.
(5) Does not taste essentially the same as freshly expressed orange juice of similar quality and is not completely free of all fermented, cooked, terpeny, or other off-flavors; or does not meet all requirements of the rules of the Department of Citrus regarding color, absence of defects, taste, and flavor; unless the immediate container thereof shall be labeled in accordance with rules of the Department of Citrus, and there shall appear on such label the word "substandard" in bold type not less than one-fourth inch high printed or stamped diagonally thereon.
[9] The congressional statute required all milk sold in the District of Columbia to contain at least 3.5% butter fat.
[10] Section 601.24 states:

The Department of Citrus shall by rule or regulation provide the manner and method to be used in drawing samples and the quantity to be used in testing and grading of citrus fruit and the canned and concentrated products thereof and shall provide specifications and methods for use of juice extractors to be used in extracting juice for such tests and grading purposes.
[11] Section 601.25 states:

The Department of Citrus by rule or regulation shall determine the method by which juice is tested for percentage of total soluble solids, the method by which juice is tested for acidity, and the method for testing fruit for juice content. Until such time as the Department of Citrus may see fit to determine such method by rule or regulation, the Brix hydrometer shall be used and the reading of the hydrometer corrected for temperature shall be considered as the percent of the total soluble solids; and anhydrous citric acid shall be determined by titration of the juice using standard alkali and phenolphethalein as indicator, the total acidity being calculated as anhydrous citric acid.